Filed 8/14/23  In re Jadon L. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re JADON L., a Person Coming Under the Juvenile Court Law. | B326288 (Los Angeles County Super. Ct. No. 20CCJP06411C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. NICOLAS L., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Arezoo Pichvai for Plaintiff and Respondent.

_____

Nicolas L. (Father) appeals from the juvenile court's order terminating his parental rights over six-year-old Jadon L. under Welfare and Institutions Code section 366.26.[1]  Father contends the court abused its discretion in finding the beneficial parental relationship exception to termination of parental rights did not apply.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Referral, Dependency Petition, and Detention*

On November 26, 2020 the Los Angeles County Department of Children and Family Services (Department) received a referral alleging law enforcement responded to a call that Elizabeth R. (Mother)[2] had been acting in a bizarre and dangerous manner, including walking around the roof ledge of the three-story building where she, Father, and Jadon lived.  The police officers took Mother to a hospital for psychiatric evaluation, where she was placed on a psychiatric hold.  Father and the maternal grandparents, Jose R. and Maria M., reported Mother had not slept for four days; she had refused to eat, stating she "'won't eat human flesh'"; she had auditory hallucinations; and she had been physically aggressive toward Father and

_____

[1]     Further statutory references are to the Welfare and Institutions Code.

[2]     Mother is not a party to this appeal.

2

threatened to harm him and the maternal grandfather. Mother had been diagnosed with schizophrenia, but she was not participating in mental health services or taking any psychotropic medication. She had been in a drug treatment program six years earlier, and Father and the maternal grandparents suspected Mother might again be using drugs given the changes in her behavior.

In a November 27, 2020 interview with the social worker, Mother admitted she used marijuana, crystal methamphetamine, and Xanax. Mother reported Father supplied her with marijuana and crystal methamphetamine, and she last used drugs on November 23. Father denied supplying Mother with any drugs. Father stated he found a baggie of what appeared to be crystal methamphetamine in Mother's jacket on November 23, and he told Mother he would leave with Jadon if she continued to use drugs.

Father admitted he had a history of substance abuse, including use of marijuana, crystal methamphetamine, and heroin. But he claimed he last used marijuana and crystal methamphetamine more than 20 years earlier when he was involved in gang activity, and his only use of heroin was in 2013 while in prison. Father agreed to submit to drug testing, and on November 30, 2020 he tested positive for 6-acetylmorphine (a heroin metabolite).

On December 4, 2020 the Department filed a dependency petition on behalf of then-four-year-old Jadon and Jadon's half-siblings, 13-year-old Christopher L. and 12-year-old Abigail L.,[3]

_____

[3]     Jesus L. is the father of Christopher and Abigail. Christopher and Abigail are not at issue in this appeal.

under former section 300, subdivision (b)(1).  The petition alleged Mother had a history of substance abuse and was a current abuser of methamphetamine and marijuana, which rendered her incapable of providing regular care to the children.  The petition further alleged Father knew of Mother's substance abuse and failed to protect Jadon by allowing Mother to reside with Jadon and have unlimited access to the child.  In addition, Mother had "a history of mental and emotional problems, including auditory hallucinations, aggressive, bizarre and erratic behavior, and a diagnosis of [d]epression and [s]chizophrenia," which rendered her incapable of providing regular care of the children.  Father knew of Mother's mental and emotional problems and failed to protect Jadon by allowing Mother to reside with Jadon and have unlimited access to him.

At the December 9, 2020 detention hearing, the juvenile court detained Jadon from Mother and released him to Father on the conditions that Father reside in the paternal grandmother's home, participate in family preservation services, and submit to weekly on-demand drug and alcohol testing.  Father did not meet the conditions, and Jadon was placed in a foster home along with Christopher and Abigail.

In December 2020 Father missed three random drug tests.  On December 28 the Department filed a first amended petition, alleging that Father had a history of substance abuse and was a current abuser of heroin.  The first amended petition alleged Father "possessed, used, and was under the influence of" heroin while the children were in Father's care, and he tested positive on November 30, 2020.  In addition, Mother knew of Father's

4

substance abuse and failed to protect Jadon by allowing Father to reside in the home and have unlimited access to the child.[4]

At the January 19, 2021 detention hearing, the juvenile court detained Jadon from Father. The court granted Father monitored visits and ordered the Department to set up a visitation schedule for Father. The Department placed Jadon, Christopher, and Abigail in Maria's home.

B.    *The Jurisdiction and Disposition Report and Hearing*

According to the January 22, 2021 jurisdiction and disposition report, Jadon continued to reside with Maria, along with Christopher and Abigail. Maria, Christopher, and Abigail stated Jadon was happy and doing well. The social worker similarly reported Jadon and his siblings appeared very happy living with Maria. The social worker offered Father visitation with Jadon while Jadon was in foster care, but Father stated he intended to wait until Jadon was placed with Maria. However, as of January 22, Father had not contacted the social worker to arrange for visitation.

Father told the dependency investigator that he contacted the police because he was concerned about Mother's mental health problems and Jadon's safety while in Mother's care. Father denied he had used heroin and stated he did not understand why his drug test was positive.

At the February 3, 2021 jurisdiction and disposition hearing, the juvenile court sustained the allegations in the first amended petition under former section 300, subdivision (b)(1),

---

[4]    Father later tested positive for heroin on January 6, 2021.

based on Mother's mental and emotional problems and substance abuse and Father's failure to protect, as well as Father's substance abuse and Mother's failure to protect. The court declared Jadon, Christopher, and Abigail dependents of the court and removed them from their parents' physical custody. The court ordered Father to submit to weekly random drug tests, and if Father missed a test or tested positive, he had to complete a full drug program with drug testing for a minimum of six months. The court also ordered Father to attend developmentally appropriate parenting classes and a 12-step program with court card and sponsor. The court granted Father monitored visits for a minimum of three times per week for three hours each visit, with the Department having discretion to liberalize visitation.

C.    *Father's Visitation and Services During the Family Reunification Period*

The July 20, 2021 six-month review status report stated Jadon continued to reside with Maria, Christopher, and Abigail. The children reported they enjoyed living with Maria and her husband, Moises S. Maria wanted to adopt the children. The social worker observed Jadon loved his siblings and was "especially attached to his brother Christopher." The social worker added, "Jadon does not like to go anywhere if his brother does not go."

The social worker reported Father was not in compliance with his case plan. Father missed all 17 scheduled weekly drug tests. Father explained he missed drug tests because he was busy with work. Further, Father had not enrolled in a 12-step program, parenting program, or drug treatment program. Father told the social worker that he should not have to participate in

6

any court-ordered services because he was not at fault and the positive drug test was a mistake.

Although Father's visitation schedule allowed for monitored visits every Wednesday and Saturday for four-and-a-half hours each visit, Father's visits were usually only two hours long, and he did not consistently visit on all allowable days. Father told Maria that Jadon was sometimes sad during visits but cheered up when he was told he would be returning to Maria's home.

As of January 14, 2022, Father still had not submitted to drug testing and had not enrolled in any court-ordered services. The 12-month status report stated Father usually visited Jadon for two hours on Saturday "due to Jadon now being in school." Maria reported Jadon was happy before and after Father's visits and there were no concerns with Father's visits. Jadon stated the visits were "good," and Father took him to the park or to eat pizza. Jadon said he was happy in Maria's home, but he loved Father.

At the March 2, 2022 12-month review hearing, the juvenile court found Father was not in compliance with his case plan and had "not consistently and regularly visited" Jadon. The court terminated Father's family reunification services and set a selection and implementation hearing (§ 366.26) for June 28, 2022.

D.    *Father's Visitation After Termination of Family Reunification Services*

According to the June 17, 2022 section 366.26 report, Father visited Jadon every other week on Saturday or Sunday at a park, usually for two hours each visit. Maria reported Jadon

was happy to have visits with Father.  But Jadon did not ask about Father outside of visitation, and he did not cry at the end of Father's visits.

Maria and the maternal uncle, Edgar R., expressed interest in adopting Jadon, Christopher, and Abigail.  Both Christopher and Abigail wanted Maria and Edgar to adopt them.  The social worker was unable to obtain a statement from Jadon.  The Department requested a continuance for 90 days to complete the adoption assessment and to provide proper notice to Christopher and Abigail's father, Jesus.[5]

The social worker reported in August 2022 that Maria continued to meet the needs of Jadon and his siblings.  Jadon was enjoying first grade, and he appeared happy in Maria's home.  Jadon wanted to stay in the same home as Christopher and Abigail.  Father visited Jadon two to three times per month.

The September 19, 2022 supplemental report for the section 366.26 hearing stated the adoption readiness assessment was approved on September 16.  Maria and Edgar were committed to adopting the children, and Christopher and Abigail wanted to be adopted by Maria and Edgar.  Jadon was unable to provide a statement concerning adoption.

E.    *Father's Section 388 Petition*

On January 3, 2023, prior to the selection and implementation hearing, Father filed a section 388 petition

---

[5]    At the Department's request, the June 28, 2022 section 366.26 hearing was continued several times to afford the Department time to conduct due diligence for Jesus and to complete the adoption assessment.

requesting return of Jadon to his custody or reinstatement of family reunification services and unmonitored visits. Father argued there was a change in circumstance because he enrolled in a methadone maintenance program on November 30, 2022, and he was "trying to get into a parenting program but he need[ed] a letter from the social worker." The juvenile court summarily denied the section 388 petition without an evidentiary hearing, finding there was "no change in circumstances."

F.    *The Selection and Implementation Hearing*

At the January 3, 2023 section 366.26 hearing, Father testified that he visited Jadon once a week, and sometimes twice a week for "a couple of hours to maybe three hours." Father sometimes could not visit because he worked in construction and his jobsite was far away, but it was "rare" when he missed a weekend visit. During visits, Father and Jadon would "play ball," "play with [Jadon's] toys," or "do whatever [Jadon] wants to do." Father testified Jadon was "very happy to see" him during visits. Jadon would "get a little sad" at the end of visits, but Jadon would cheer up when Father told Jadon he would visit the following week.

Father's attorney argued the beneficial parental relationship exception to termination of parental rights applied because Father consistently visited to the extent permitted by his work schedule; Father "had good visits with his son"; Jadon recognized him as his father; and it would be beneficial for Jadon to continue to have Father in his life through a legal guardianship. Minor's counsel argued the exception did not apply because Father's visits were "not always weekly"; Jadon and his siblings had been "comfortable and thriving in their

9

grandmother's care"; Jadon had been out of Father's care for three years;[6] and the benefits of the relationship with Father did not "outweigh the benefit to Jadon of remaining in a long-term caring home with his grandmother and his siblings."  The Department's attorney similarly argued Father had "maintained somewhat regular visitation," but there was no evidence that ending the relationship would be detrimental to Jadon, and "adoption would create a sense of stability for Jadon to belong, personally, with his maternal grandmother and uncle," as well as his brother and sister.

The juvenile court found by clear and convincing evidence that Jadon was adoptable and no exception to termination applied.  The court found "there is a bond" between Jadon and Father, and Jadon identified Father as his father, but "visitation [was] not as consistent as maybe [Father] would like it" (because of work obligations).  The court further found "the benefit of permanence outweighs the benefit to not terminate parental rights" and "not terminating parental rights would affect the sibling bond for the other siblings in the home, for all of the reasons outlined by" the Department's attorney.

Father timely appealed.[7]

---

[6]     In its respondent's brief, the Department acknowledges that Jadon was out of Father's care for two years, and not three years as stated by minor's counsel.

[7]     Father stated in his notice of appeal that he was appealing from both the order terminating his parental rights and the order summarily denying his section 388 petition.  However, he failed in his appellate briefs to present any argument addressing denial of his section 388 petition, thereby forfeiting or abandoning the

10

## DISCUSSION

A.    *Governing Law and Standard of Review*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child."  (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'"  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), "the parent may avoid termination of parental rights" if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child.  [Citations.]  The language of this exception, along with its history and place in the

_____

argument on appeal.  (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [issue not raised on appeal "deemed waived"]; *Limon v. Circle K Stores Inc.* (2022) 84 Cal.App.5th 671, 687 ["'Issues not raised in an appellant's brief are deemed waived or abandoned.'"].)

11

larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *In re B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.E.* (2023) 91 Cal.App.5th 683, 691.) Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317.) When determining whether termination of parental rights would be detrimental to the child, courts need to consider "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633; accord, *In re D.P.* (2022) 76 Cal.App.5th 153, 164.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, at p. 633; accord, *In re Katherine J.*, at p. 317.) "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial

evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion."  (*Caden C.*, at p. 630; accord, *In re I.E.*, at p. 691.)

B.      *The Juvenile Court Did Not Abuse Its Discretion in Finding the Beneficial Parental Relationship Exception Did Not Apply*

Father contends and the Department concedes Father established the first two elements of the beneficial parental relationship: (1) "'regular visitation'" and (2) "'the child would benefit from continuing the relationship.'"  (*Caden C., supra*, 11 Cal.5th at p. 632.)  Father consistently visited Jadon once every one or two weeks for two hours each visit, although he was allowed two visits each week.  Jadon was four years old when he was detained from Father.  By the time of the section 366.26 hearing, Jadon was six years old and had spent two years out of Father's physical custody.  But Jadon knew Father was his father, and Jadon stated he loved Father.  Maria reported Jadon looked forward to visits with Father, and Father testified Jadon was "very happy to see" him at visits.  During visits, Father and Jadon would play together at the local park or go out to eat pizza.

The parties disagree on the third element: whether termination of the parental relationship would be detrimental to Jadon.  (*Caden C., supra*, 11 Cal.5th at p. 633.)  Father contends the juvenile court abused its discretion in finding the benefits to Jadon of continuing his relationship with Father did not outweigh the benefits of adoption.  There was no abuse of discretion.

As discussed, Jadon said he loved Father and was happy to see him.  And Father testified Jadon would "get a little sad" at

13

the end of visits, but he cheered up when he learned he would see Father the following week.  However, Maria reported Jadon did not cry after visits or ask about Father when they were not together.  The juvenile court found Jadon had "a bond" with Father, but the record does not reflect a "substantial, positive, emotional attachment." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Rather, the relationship was more similar to that of a friendly relative having play dates with Jadon.  As the Court of Appeal explained in *In re Katherine J., supra*, 75 Cal.App.5th at page 318, "the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent." (Accord, *In re B.D., supra*, 66 Cal.App.5th at p. 1230.)

Moreover, for the prior two years, Maria met Jadon's needs, and Jadon was happy in Maria's home.  And Maria and Edgar wanted to adopt all three children.  On this record, the juvenile court did not abuse its discretion in finding it would not be detrimental to Jadon to sever his relationship with Father when balanced against the benefits of a permanent home with the maternal grandmother, maternal uncle, and siblings.[8]

---

[8]    Father contends the appropriate permanent plan is legal guardianship, and not adoption.  But as the Supreme Court explained in *In re Celine R., supra,* 31 Cal.4th at page 53, "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care.  (§ 366.26, subd. (b).) . . . . 'Adoption is the

14

## DISPOSITION

The juvenile court's order terminating Father's parental rights is affirmed.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.

---

Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (Accord, *Caden C., supra*, 11 Cal.5th at p. 631 ["'[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption'"].)